Thank you, Your Honor. If you need your glasses, I'm certainly willing to put them on you. No, that's fine. I'll borrow yours. I'm sorry? Then I'm in more trouble than you know. Good morning. My name is Greg Wilkinson. I represent the 12 California cities and local agencies who are the appellants in this matter. I'd like to begin by reserving three minutes of my time for rebuttal. And I also want to let the panel know that I am available to answer any questions it may have about the NEPA arguments that we've raised in our brief. But my intention this morning is to focus on two other issues that we have argued in the briefs that are before you. The first of those is the applicability of Section 2C.2 of the Endangered Species Act to the facts and circumstances of this case. And the second is whether the procedures that were followed by the Fish and Wildlife Service in designating critical habitat for the Santa Ana sucker violated the ESA and the Administrative Procedure Act. Starting with Section 2C.2, that section states in a straightforward manner that it is the intention of Congress that the service shall cooperate with local agencies to resolve water resource issues in concert with the conservation of endangered species. But the record in this case shows that the service did not make any reasonable effort to cooperate with local agencies to resolve the water resource issues that were raised by the designation of critical habitat on the Santa Ana River. There is no dispute in this case that the river, the Santa Ana River, is a local source of supply that is relied upon by about 5 million people in San Bernardino, Riverside, and Orange Counties. There is also no dispute in this case that the allocation of water from the river for more than 40 years has been determined by two interlocking judgments of the California Superior Courts. And there is further no dispute in this case that just a year prior to the adoption of critical habitat by the service, that the State Water Board of California issued permits to two of the appellants in this case through a water right decision, D-1649, that concluded the permits they were issuing would have no impact upon public trust resources, including specifically the Santa Ana Sucker. But the record also shows here that the actions of California's courts, those interlocking judgments I mentioned, and the State Water Board's decision were effectively ignored by the service when it adopted the critical habitat designation at issue. Instead, the service simply noted in its final rule that only, and I'm quoting, some portion of the water diversions proposed or currently occurring can be accommodated consistent with the conservation measures necessary for Santa Ana Sucker. The service then dismissed the State Water Board's allocation decision by asserting that, I'm quoting, and under state law, this action had been final for a good period of time prior to the issuance of the final rule by the service. But this potential action, they said, has not been evaluated or approved by the federal agencies involved. Now, we believe that this attempt to cast aside the state's water allocation system and decades of reliance upon the decisions of the 2C2 of the ESA, but the district court here found that that section is nothing more than, and I'm quoting, a non-operative statement of general policy, according to the court, that has no effect upon other provisions of the Endangered Species Act. We believe that in issuing that ruling, the district court erred. Now, a plain reading of the statute shows... Well, because the statute is titled a Declaration of Purposes and Policy. Are there any substantive or procedural requirements that are part of that section that you're relying on? We believe that there are, Your Honor. Rather than using suggestive words like should or may, what Congress chose was the word shall, and it said the government shall cooperate with local agencies in implementing the ESA. Shall cooperate with local agencies to resolve water resource issues in concert with the conservation of endangered species. That seems to be a pretty clear statement of Congress's intent. It's not really something about which there is much dispute. But if you read that provision in conjunction with Section 4, isn't Section 2, the 2C, you're talking about a generalized policy statement, and aren't the substantive requirements set forth in 4? We think the two provisions can be read in peri materia as they should be, and that is that Section 2C2 is intended to express what the government should be doing, how it should be implementing Section 4. It doesn't retreat to its office or collective offices and work in a vacuum, which is more or less what occurred here. Instead, what the section directs is that the government employees who are working on these issues should get out of their offices and cooperate, work together jointly with the local agencies to resolve these issues. That's pretty clear from the Senate report that accompanied the legislation that was adopted in 2C2. Isn't Section 4 then just giving you guidance in what to do in that regard? I think it is more than that. I think it does tell you the substance of what you're supposed to do. But it doesn't tell the agency how it goes about it. How does it engage in its relations with others who may be affected by these determinations? The history suggests that, and this is the Senate report that accompanied the bill that became 2C2, that Congress intended to instruct the federal government to work with, that was the Senate report's words, to work with state and local agencies to resolve water resource issues. They wanted close cooperation between the service and the state and local agencies. As I see it, Section 2 says the goal is conservation, and you shall cooperate with the state and local agencies in doing that. And then Section 4 sets out how that cooperation is to be carried out. Notice and comment, make sure that you provide justification for that. So that explains how you're to work with local and state agencies. Shouldn't we then just look to the substantive and procedural requirements of Section 4 in determining whether the agencies did that in this particular case? I think you have to look at both sections, because if you fail to do that, you're in effect reading Section 2C2 out of the statute, which is what the district court did. What you've got here is a situation where both these sections, 2C2 and 4B2, came into the act at the same time. And when Congress uses the words notice and comment in Section 4B2, it would appear to us that they were intending something somewhat different than what they were intending by their use of the words shall cooperate in Section 2C2. And remember, 2C2 is unique to water resource issues. It's the only substantive area that Congress intended to address in 2C2. And we think that the reason for that in part was that Congress was acting not long after the Supreme Court's decision in TVA v. Hill. You may remember the Teleco Dam situation where a project was effectively completed. They found a population of fish down below the dam. The act was applied to stop the project in its tracks. And it appears to us that what Congress is saying here is in reaction to that, saying, no, we want the federal government in implementing 4B2, in designating critical habitat, to cooperate, to work closely with, to work jointly with towards the same end in developing the critical habitat designation. And to some degree, the service did that prior to embarking upon this journey that led us to the final rule. They worked with local agencies to develop a multi-species habitat conservation plan for western Riverside County. It's the largest of those plans in the United States. That went on for quite some time. It did, Your Honor, and it covers a great deal of ground. But it came to a conclusion. And the conclusion, in part, was that they would protect hundreds of species, including the Santa Ana sucker, specifically called out as one of the covered species. And in the course of developing that habitat plan, the service said, we agree that we will not designate, to the maximum extent allowable, as critical habitat lands that are covered by this plan unless we find that the plan is not being implemented. They said that in the plan. They said that in the implementing agreement that accompanied the plan. So that's what happens when the service works together with people. But when they went into their offices and said, well, now we've got to deal with critical habitat here, they decided something completely different that was not only inconsistent with what they had said in their habitat plan, it was also inconsistent with the no surprises rule. And you may remember that when it was announced by Bruce Babbitt many, many years ago. A deal is a deal. We're going to stick by what we say. And the no surprises rule is complementary of what the service agreed to in the habitat plan. The no surprises rule says, as long as the plan is being implemented, we will not require additional compensation absent unforeseen circumstances. Now here, this particular designation was brought about by the service for the precise reason that they wanted more than what they got in the habitat plan. But they made no finding that the habitat plan was not being implemented. They're trying to argue that subsequently. And they made no determination of any unforeseen circumstances. They're also trying to argue a little bit of that post hoc. So let's deal with those things. They violate the commitment that they've made in the plan itself after they've enticed all these landowners, including our client agencies who operate many of the facilities along the Santa Ana River, into the plan. Then they reverse course and say, oh, well, we want more. They don't make a finding that the plan isn't being implemented. They, in fact, admit during the hearing before the district court that it is being implemented. Now they argue that, well, gee, the plan wasn't protecting any habitat. But the record shows that by the time the final rule was adopted, 88% of the total sucker habitat, Santa Ana sucker habitat, in the Santa Ana River watershed was already under protection. And that the Regional Conservation Agency, which administers the plan, was moving very quickly to acquire additional lands. They'd already acquired about 27% of the other lands that needed to be acquired by the time that the final rule was adopted. So what you have is this odd situation which gets even stranger when a year after the designation is made, the service goes forward and conducts a consultation on the habitat plan itself and concludes that the plan not only will not jeopardize the species, it won't impair critical habitat. And they say, we don't want anything more. Now the service tries to spin that to say, well, your arguments are moot. We're not asking for anything more. In fact, the designation is still on 3,000 acres in the protected area, and that makes it not moot. Let me direct you to an area that is of particular interest to me. The final rule cites to a couple of studies that were not available during the comment period. Setting aside the question of whether these studies merely confirm what had already previously been disclosed during the comment period, if you'd had an opportunity to comment on these new studies, what would you have said? We would have said, and we were familiar with the general nature of the studies, the data that was in them. We weren't familiar with the fact that the service was trying to argue from them that the sucker and its habitat have continued to decline. We would have argued, had we been given the opportunity to do so, that those studies, in fact, do not support the service's rationale. At most, what they show is that substrates that are needed by the fish fluctuate,  and that the abundance of the species is a bit like a sine wave. It goes up and down. And there's no evidence in those studies, and they do not support the contention that the service makes, that the sucker habitat or the species itself is in continued decline. It just isn't there. Am I correct, then, that the underlying data was not new? It was all available? But what you're objecting to is the ability to make this argument, to comment on the significance of that data. That's right, because in the draft rule, Judge Wynn, in 2009, the service had simply indicated that these studies were there and that the studies showed that the substrates of the species, the cobble and the gravel that are downstream that the species uses for habitat, were fluctuating. And there's no question that that's true. But there was no indication in the record, and certainly no indication in the proposed rule, that the service was using that data to show that there was a continued decline of the species. Had they said that, we would have been able to make the comments that we've now made to the district court and that we've made in our briefs here, but we weren't given that opportunity. The other thing that's unique about this case is the service was not writing on a blank slate. This was not the first time the service had designated critical habitat for the species. They did it just five years before. And when they did it, they said then the things that we are saying now. They said in 2005 that the multi-species habitat plan was protective, which they've now again concluded in a 2011 consultation and not asked for any additional protective measures, which makes you wonder about the rationale that they used to come up with the final rule. But they said in 2005, we're not going to designate those lands that are covered by the multi-species habitat plan, because it's already protective. And we're not going to designate the lands that are downstream of Seven Oaks Dam, which is the area immediately downstream of the dam, upstream of 1B and 1C. It's not an area where the fish live. It's not an area where they can live. It very rarely sees water. The only thing that's there are PCEs, primary constituent elements, flow periodically, and coarse gravel. And the point we're making here is that they've not only reversed course, but they've used the wrong test in designating those lands. They've tried to designate unoccupied habitat based upon the test for designating occupied lands. They've designated the primary constituent elements, which they can do when they designate occupied lands. They have to show why the area itself is important when they're designating unoccupied habitat, and they simply haven't done it. I think I'm eating into my time here. Let me ask you a general background question before you sit down. On the San Bernardino Water Conservation District, how is my life complicated if this fish is listed? Okay. I have a contract for water from Seven Oaks Dam. That's one of the permits that was issued by the State Water Board. Okay. The economic analysis that's been issued by the service says I may lose 25,000 acre-feet of water a year. That's enough for, gosh, a million people almost every year. Just based on that. So I've now got to go out and look for more water. To replace what I've lost from this. Sure. I've already lost water. In addition, I maintain a variety of facilities that I use to deliver water to my consumers. To maintain those facilities, I frequently have to get what's called a Section 404 permit from the Corps of Engineers. That triggers an obligation on the part of the Corps to consult. So that's the impact. This is a little different than the situation where it's just economics. We're talking about agencies here that have the responsibility under law to provide water to their citizens. They have the responsibility to provide flood control. And the record here shows, really without much dispute, that both of those activities are being adversely affected by this rule. Thank you. Thank you. Thank you. May it please the Court. My name is Alan Brabender with the Department of Justice here on behalf of the Fish and Wildlife Service and the other federal defendants. With me at council table is Mr. John Busse of the Center for Biological Diversity. I will use the first 15 minutes today. Mr. Busse, the remaining five. And I think, first of all, I'd like to back up and provide some context, some statutory context that I think will help the Court better understand the government's argument and why the plaintiff's argument fails. As the Court knows, the Endangered Species Act is intended to conserve and protect species listed as endangered and threatened. And the Act provides several mechanisms. One mechanism is the Section 7 consultation process that we've already heard discussed today, which only applies to federal agencies. Another protection is the Section 9 prohibition on take. Unlike Section 7, Section 9 applies to any person. Any person who takes an endangered or threatened species without authorization is subject to substantial civil penalties and also criminal penalties. Now, to avoid these penalties under the Act, someone, a person, may seek a permit from the Fish and Wildlife Service to take a species. And take is a term of art which essentially means to kill or harm an animal in some way. Yeah. And... Sometimes they use the word harvest. Right. That's true. It's part of the definition. And one of these permits allows someone to incidentally take a species in the course of otherwise lawful activities, running a water district, for example. These are called incidental take permits. And one required component of an incidental take permit is a habitat conservation plan. A habitat conservation plan discusses the extent of the anticipated take, the mitigation that will be used to prevent the take, and how the plan will be funded. Then if the Fish and Wildlife Service accepts the plan and issues a permit, then the permit holder is shielded from liability under the Act for killing or harming a listed species. For complex multi-party permits or plans, the Fish and Wildlife Service also requires the applicants to enter into an implementing agreement, which further defines and clarifies the roles of the permittees under the plan and permit. So when you see the argument in its proper statutory light, the plaintiff's suggestion that the provisions within the Western Riverside Habitat Conservation Plan, an implementing agreement, that these are some sort of bargain for negotiated or contractual assurances is nonsense. The plaintiffs need this plan in order to avoid liability under the Act. These are not voluntary conservation measures. Now, in the course of giving the plaintiffs a permit to take species, the Fish and Wildlife Service never promised not to designate essential lands that are covered by the plan in a critical habitat designation. Doing so not only lacks any upside for the Fish and Wildlife Service, making such promises would violate the Endangered Species Act and the APA. A federal agency cannot promise to ignore its statutory obligations in an agreement with a private party. A federal agency cannot agree to the substantive outcome of a rulemaking before the notice and comment rulemaking procedures occur. What the Fish and Wildlife Service, what the documents say, what the plan and agreements say, merely reiterates what the ESA allows the agency to do, to exclude lands from a designation to the maximum extent allowable after notice and comment. What do you make of the argument that because the final rule for the first time was in decline post-2004, relying on some new studies, they never had an opportunity to come in and argue that the available data really demonstrates a fluctuation in the species population rather than a decline? First of all, the plaintiffs didn't plead such a complaint in their complaint. There was no APA violation of the APA procedural provisions. There was no such claim in their complaint. Now, to the extent what they're saying is, well, it's relevant to our argument that the agency abused its discretion in not exercising its discretion to exclude plan-covered lands from the critical habitat designation, then there's several responses. First of all, that decision is unreviewable, so the argument comes within the context of an unreviewable decision. Second, the declining population trend of the species was only one reason why the agency decided not to exercise its discretion. There are other reasons, such as the regulatory benefits of inclusion, the educational benefits of inclusion, and the benefit of strengthening other laws that protect the species. It's really a procedural violation that they're alleging, isn't it? Right, and as I submit to you, that has no basis in the complaint. But under this court's decision in Kern County Farm Bureau, the agency has no obligation to reopen the public comment period if it's simply relying on data to reaffirm what it has already said. That begs the question on what the data does. In the proposed rule, the Fish and Wildlife Service put before the public its view that the population was declining. The studies merely reaffirmed that. The plaintiffs had every opportunity to comment on the declining nature of the population. They could have submitted studies that showed that the population trend had reversed. They didn't do that. They submitted studies that, in fact, confirmed the Fish and Wildlife Service's view. And they also, the plaintiffs under Kern County Farm Bureau, the plaintiffs have to show that not having the ability to comment caused some prejudice. And I would submit to you that they cannot show that here where the Fish and Wildlife Service relied on multiple reasons for declining to exercise its discretion to exclude these lands. So if I understand your response correctly, setting aside whether this claim of procedure error was properly pled, and I know that's an issue in this case, but we get to address the allegation itself. Your response is that because it was already known that the population was in decline, they could have made the same comment that, in fact, the data showed fluctuation in the species population rather than decline during the open comment period. Can I understand that correctly? Yes, they absolutely should have. Now, I guess moving on, unless there's any further questions, I'll move on to the ESA Section 2 arguments. Section 2 does not require the Fish and Wildlife Service to cooperate to resolve water resource concerns. Now, even if that were an operative provision of the ESA, and it's not, there is no water resource issue created by a critical habitat designation. A critical habitat designation is merely an indication of status on paper. There are no physical impacts that result from a critical habitat designation unless or until another federal agency, at some point in the future, proposes to take an action. That is the basis for what is the correctly decided Douglas County decision, one of the bases, at least. And it is also a reason why ESA Section 2 doesn't apply on its face. Now, it is also not an operative statement. It is not an operative provision of the ESA. On its face, it states that it is merely a policy provision. It is black letter law that such policy statements and statutes are not binding. And even if the plain language of the statute weren't sufficient, Congress in the legislative history noted that it was not intending that provision to change the substantive requirements of the Act. Rather, what it does is outline Congress's policy, which it hopes to accomplish in the remaining portions of the ESA. Section 6 of the ESA deals exclusively with state and local cooperation. But with respect to cooperation during a critical habitat designation, Section 4 provides the relevant standards. It requires the agency to provide actual notice to state agencies of the proposed designation, which is substantially more processed than is due to the general public. And if the service issues a designation that is inconsistent with the comments of the state agency, then the ESA requires the service to provide written comments to the state agency. Again, this is substantially more processed than is due to the general public. And there's no dispute that the Fish and Wildlife Service complied with Section 4 here. In fact, the Fish and Wildlife Service did more than what Section 4 requires. It met with plaintiff's representatives on several occasions. The bottom line is the ESA required nothing more of the service here. And... Are there some personality conflicts that underlie all this? I don't think so. I don't think there are personality conflicts. I think the agency was doing its best to make the right decision. And obviously the plaintiffs have economic concerns. As I think counsel stated, it will cost substantially more to get water from another location. But the fact that they have economic concerns does not entitle them, for instance, to bring a claim under NEPA, which is focused exclusively on environmental interests. And we would submit to the court that the plaintiffs have not sufficiently shown that through this lawsuit they are seeking to protect their environmental interests as opposed to economic interests in the supply of water. And... What was gained by that period of close cooperation in the early days? Well, as I explained, they're shielded from liability under the Act. They requested an incidental take permit to shield them from ESA liability. And that's what they gained. The Fish and Wildlife Service was simply doing its job in issuing an incidental take permit. And I see I have a lot of time. If the court would like me to address anything else, otherwise I will yield the remainder of my time to Mr. Busse. Thanks. Thank you. Good morning. John Busse for the defendant intervenors. On that issue of the appellant's harm being primarily economic, I'd add to that that not only is the harm primarily economic, but it's quite attenuated. And in that respect, I think Mr. Wilkinson described how the designation of critical habitat would lead to costs predicted in the economic analyses. And those costs actually range somewhat humorously from... Well, there's an amazingly wide range in the predicted cost, $15 million up to something like $3 billion. So a very wide range of different opinions on what this will ultimately cost. But the key is what it will ultimately cost, because the designation of critical habitat itself does not directly impose costs. These costs come into play only as a result of future federal actions, if they occur at all. Well, the response to my question about the San Bernardino Water Conservation District seems to me to raise... But these really strike me as a serious concern if some municipality whose responsibility is to supply water to hundreds of thousands of people has to rearrange its whole operation for this fish. I think it is a serious concern. The agencies that are the appellants in this case have a difficult and challenging position. They have a valid concern about what this may mean, but it's a concern about what it may mean in the future, when they actually do something. When another federal agency is required to take some action, it will then consult, as we saw in the previous case, and as your Honor asked about the Sacramento River example, it's a different agency in this case, the Fish and Wildlife Service, but the federal agency taking the action, say it's the Army Corps of Engineers with the Seven Oaks Dam, will then have to consult with the Fish and Wildlife Service about what this may mean for this fish. And at that point... So explain to me, following up the colloquy I had with Appellants Council, what's the San Bernardino Valley Water Conservation District going to do? What it will do will depend on the reasonable and prudent conditions that are considered and, in most instances, negotiated with the local agencies as a result of that future consultation. That's the cooperative process that the agencies want to have happen here. That's when it ought to occur under the Endangered Species Act. Our position isn't that Section 2C2 means nothing. I don't think it means nothing. I think it means something. How are they going to get their water? How do they get their water? How are they going to get their water, following up on the concerns? First of all, there's no indication that this decision has any immediate implications for future water allocation decisions. It's not a water allocation decision. It may mean something for the future allocation of water, but that's an answer that I can't provide you, but it's an answer that various agencies, presumably working in cooperation as the Federalist system requires and is specified in this policy preamble in the Endangered Species Act, provides. That's what will happen. I can't predict the outcome of that. I hope it's something that does balance the needs of this seriously endangered fish with the people, and that's what will have to be determined by those agencies working at this point. This critical habitat designation is intended to look at what the essential habitat to conserve this fish is. That's all it does. The agency made a valid and rational determination of what areas need to go into that decision. I think the concern that was expressed here is primarily one of an agency changing its mind. The concern about not being able to comment on the studies and the previous course from the Fish and Wildlife Service, well, frankly, the explanation is politics. Politics dominate what the position of an agency is, and politics change from time to time. The U.S. Supreme Court has recognized this in decisions like National Association of Home Builders versus Defenders of Wildlife, where it says an agency is entitled to change its position, even for political reasons, as long as it can articulate a rational basis for that decision. With respect to the Western Riverside Conservation Plan, it articulated this rational basis. Not only did it cite studies showing that the species was declining, but it also noted that when that conservation plan was initially adopted in 2004, Fish and Wildlife Service anticipated that sucker habitat would be conserved under the plan, but at this point in time, or at least at the point in time of the final critical habitat designation, none had. No essential habitat had been conserved under the plan, and that's articulated and cited in the final critical habitat designation. That's what we're looking at today, a disagreement about an agency changing its mind, but an agency that has changed its mind for a valid and reasonable reason. Nothing particularly unusual or dramatic about that. What is the source of the water dependent on the snow cap in the mountains here? Not being intimately familiar with the hydrology of the area, I'd say yes, there is snowfall and runoff from the San Bernardino Mountains that will be collected and gathered, so that's part of the issue, but that's not the whole picture in terms of the water supply, which is quite involved and complicated. There's so many different factors. There's groundwater that's produced. There's imported water. It's a range of supplies that these suppliers rely on, and in the future, there will be water allocation decisions. Does the water come from the Colorado River to these folks? Not a question I can answer. Where does the water come from? Some of it is local supply, both from runoff and groundwater. There may be Colorado River. Mr. Wilkinson can answer that. I'll do that. I know about the Tohono O'odham Wash. Mainly a lot of big stones, and I've hiked up those mountains as a kid, and I know there were fast-flowing rivers. The ability of the system to produce some stones of the right size, and the ability to get the right amount of water  The big problem is that the substrate that the sucker needs is at issue in this case with the designation of this particular habitat. I'm very close to running out of time. One further thing I wanted to mention is that the issue about exclusion versus inclusion of habitat under the 4B2 standard, it's essentially the same issue as in the preceding case with the sturgeon. The issues with the non-binding commitment under the Western Riverside Plan doesn't change the conclusion that this is an issue that was committed to agency discretion by law. There's no enforceable standard in terms of not excluding. While the agency may exclude at its discretion, there's a standard governing that exclusion. We can look at that and challenge it. It's still a discretionary act, but not one that's committed to agency discretion. The other side of the coin is not a symmetric side of the coin. It's a decision that's absolutely committed to agency discretion by law, and the agency of action should be upheld. Thank you, Your Honor. Thank you. Your Honor, I am familiar with the hydrology in this area. There are three sources of water for Southern California. One is local, and that's what we're talking about here. The second is the delta, the Sacramento-San Joaquin Delta. The agency that's represented by Mr. Brabender here has already worked long and hard to throttle back the export of water from the delta, so that source is declining in its importance to Southern California. The third source is the Colorado River, Judge Pragerson, as you recognized. That is subject to limitations imposed first by the Colorado River Compact and secondly by the Supreme Court in the Arizona v. California decision, which holds California to its allocation of 4.4 million acre-feet. We are at that allocation and have been for some time. In fact, we've exceeded it for some time, but we're getting back within it. So what that suggests is that the local source of water, which we're talking about here, is extremely important, and if these agencies do not have the ability to take water as a result of this decision. And the Catron County case, which I think is very different from the Douglas County case, is almost on all fours in terms of the impacts, both in terms of impacts to water supply and in terms of impacts to flood control, which is the other big issue at stake here. The last big flood, as you know, on this river was in 1969. Prior to that, the really big one was in 1938. It doesn't flood very often, but when it does, it's a lulu. And that's why the Corps, who has issued comments as part of this, and said this habitat designation is going to adversely impact flood control. It's going to cause damage, and it's going to be now. I mean, it doesn't take anything other than some rainfall to start seeing that happen. It's going to cause damage, and it could cause loss of life. And that's why the Corps was concerned about this designation. Now, the government lawyer, Mr. Brabender, denied that the provisions in the Habitat Conservation Plan were negotiated. That isn't supported by the record. I think, Judge Pragerson, as you recognize, this took a long time to develop. The language in that plan was very much negotiated. And for the government to then negotiate language saying they would not designate to the maximum extent allowable, they get people to sign up, and then they turn around and say, well, we're going to designate anyway because we want more protection. And they don't, Judge Wynn, in the course of doing that, look at the language in Section 4B2 which says they have to consider any relevant impact. Well, a relevant impact, as we've argued in our brief, is that it damages these habitat plans. There is evidence in the record, both in terms of comments by the Flood Control District, which said this is going to undercut this plan, and by the Regional Conservation Authority that administers the plan that says the same thing. For the government to ignore, which they did, they utterly ignored their commitments in the Habitat Plan, that's a relevant impact we think they should have looked at. But for them to have ignored it and to not have made any kind of good faith effort to look at whether they could, consistent with the language and their commitments in the Habitat Plan, have excluded these areas, we think that amounts to, frankly, bad faith. They're getting people enticed into these plans, and then they're reversing course when it suits them. We don't think that's reasonable. Now, you asked Judge Wynn about the two studies, and yes, they do have to disclose those studies. The case that's relevant on that is the Idaho Farm Bureau case. That's the Bruno Hot Springs snail case, where, again, the government failed to disclose certain studies, and the court looked at not just the data, but also how the government was going to use the data. And that's the thing that's missing here. The data was there, but how the government was going to use it wasn't disclosed. In fact, they kept saying all the way through 2009, well, we're considering excluding these lands because of the protective measures that are in place. Then they reversed course and they adopted the designation without disclosing how they were planning to use those studies, and that they can't do under the Idaho Farm Bureau case. I would point out that we have raised sufficient allegations regarding the disclosure of those studies. If you look at page 50 of our reply brief, we've laid it out pretty carefully in terms of where we've alleged, what we've alleged, and the fact that our 60-day notice laid this out in great detail, and that was specifically incorporated into the complaint. So it's there. The government just doesn't want to see it. Is there anything underway with these water companies in the area of recycling? Oh, absolutely, yes. What are you doing? Several things. There is a lot of recycling going on. We've got basin cleanups well underway. We're using the water that is locally available to make basins that are unusable currently because of pollution problems to bring them up to code so that we can rely on those. There's Water Factory 21 that's taking basically toilet-to-tap water in Orange County, and it's making it drinkable. The water that's consumed in Orange County... How many millions of gallons? Oh, gosh. I don't have the answer to that. I can tell you that the water that's consumed in Orange County from the tap has probably been flushed several times by folks along the river along the way. We're pretty good, and we're better, frankly, than Northern California in terms of our ability to recycle and reuse water. We are cognizant of that. Are you telling me that people in Orange County are drinking recycled wastewater... Absolutely. ...that comes out of the sewer system? Well, it's recycled. It's cleaned up, but yes. But I asked you that question. Not only are they using it, but the fish is living in it. The fish doesn't live above what's called the Ricks Treatment Plant, which is a plant that serves Rialto. It's a rapid infiltration and extraction facility. It puts water into the river, which is then used downstream. And, in fact, this is all required under the interlocking Superior Court judgments that I mentioned. There are specific numeric requirements that have to be met by the upstream folks in terms of putting water into the river first at the Riverside Narrows and then farther downstream at Prado in terms of the quantities of water every single year that have to be provided to the river. And the bulk of that water is return flow, quite candidly. But what you're getting at here, I think, is something that is really at the heart of this case. Well, are they just putting back into the river water that's had tertiary treatment? Yes. Usually tertiary treatment, it's got, oh, I don't know, it's got all kinds of different, you know, UV and things applied to it. Yeah. So, yes, but, in fact, it is. I mean, this river, I know you're familiar with this river. It's dry 95% of the time, maybe more than that. And the flows are not substantial naturally. They're highly variable. But what's in the river tends to be water that is put back after use by San Bernardino, by Redlands, by Riverside, all the way down the river until it reaches the Orange County Water District and then OCWD puts it to use. So has it been used previously? Yes. Has it been used multiple times? Yes. Is it recycled? Yes. And it's darn good water. But that's the situation we're finding ourselves here in Southern California. The Delta supplies are very fragile. This court's Delta smelt decision and its Salmonid biop decision have foreclosed a lot of efforts to make use of that water in Southern California. So what we have left, essentially, is the local supply. And that's what's at stake here. But even more directly, what's at stake here is whether the government is going to work with people to solve these problems or they're not. We think that when they work with people, they can come up with solutions, and that's the multi-species habitat plan. When they retreat to their offices and they stiff-arm people, give them the Heisman and say, no, no, no, we're not going to talk to you. And there are e-mails in this record indicating that. We're not going to let our economic people talk to you. And there are those e-mails. You ought to run for Congress. Well, I'm just, you know, what I do in my spare time is I run the food bank in Riverside and San Bernardino counties. I'm the chair of the board of that food bank. And we are in a tough, tough area. We've got the second highest foods insecurity level in the United States in this area that's at issue here. Just a little aside. But there's a lot of great development that's going to be going on now and will go on. Not if they don't have water. No, but there's a lot of things happening. Well, we've got a lot of people who are moving out from the central cities like L.A. and Long Beach, for example, because the land is cheaper where we are. But if they can't develop the housing for these folks, they don't have that choice any longer. You know, we had an environmental justice claim as part of our complaint. We haven't pushed it here because, frankly, we think we've got better arguments to make, but that is in this case too. Anyway, I'm way over my time, and I apologize for that. Those areas there in Riverside County, they're going to be the hub for the entire western hemisphere in distribution of goods. Well, I've got a spot in the Chamber of Commerce out there that you might want to join. No, all you've got to do is read the paper and figure out what's going on. It's a growing area, and it's growing because there's a demand for it. We're building 300 million square feet of warehouse space. Oh, yeah. Yeah, it's happening. What do you think that's up there for? Because land is cheap. What? Land is cheap out there still relative to other areas, and so, yeah, it's growing. What's going to happen with those? Anybody's guess, but that's a land use concern. They certainly won't happen without water. Sure, we need water. Yeah, they do. The guy named Mulholland figured that out. I'm not sure I would agree with the way he did it, but yes, he got that point too. He knew how to get the job done, didn't he? He didn't have to deal with the Endangered Species Act. Well, but you don't know that. You didn't know Mulholland the way I did. He was a little before my time, but I've heard lots of stories. Maybe you and I should get together and we can talk about them. Now, seriously, I think that Southern California, as you know, is highly dependent on imported water. What we are finding is that those sources are not limitless and that we need to look very hard at our local sources. What we need to do is we need to recycle all of our wastewater and start drinking it as people are doing in most of the other countries. I agree with that. But because that water that comes out after it's had full tertiary treatment is so pure that it's used in boilers and refineries. And even if you hold up a glass of it, you don't see it. The glass looks empty, so you have to put certain minerals and other things back in. Yeah, it is amazing. Some of the technologies are fantastic, and I want to give you the assurance we're doing those things. And we've had them for... I'm sorry? They've been in effect and being used for decades and decades, but not here. Oh, I think water... We're doing it here, but we're not drinking it yet. But, you know, we have it in our fountains over here if you want to take a drink. I'm happy to. We are in a water short area. I was fascinated by Judge Parker's questions. You, sir, are in a water-rich area, and I'm sure this is somewhat difficult for you to understand, but we... Don't say that. We need that local water. I didn't understand any of this until I read all the briefs. Well, great. Now I had to say everything. Thank you all very much. Was that it? Well briefed, well argued. Was that it? Thank you.
judges: Pregerson, Parker, Nguyen